## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-03064-SBP

B.A.B.,[1]

     Plaintiff,

v.

MARTIN J. O'MALLEY,[2] Commissioner of Social Security,

     Defendant.

---

## OPINION AND ORDER

---

**Susan Prose, United States Magistrate Judge**

     Plaintiff B.A.B., brings this action under Title II, 42 U.S.C. §§ 401 *et seq.*, of the Social Security Act (the "Act") for review of the Commissioner of Social Security's (the "Commissioner") final administrative decision denying his claim for disability insurance benefits ("DIB"). The court has carefully considered the parties' briefs, the social security administrative record, and the applicable law. No hearing is necessary.

     For the reasons below, the court **REVERSES** the Commissioner's decision and **REMANDS** this case for further proceedings consistent with this Order.

---

[1] Pursuant to D.C.COLO.LAPR 5.2(b), "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

[2] Martin J. O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See* 42 U.S.C. § 405(g) (an action survives regardless of any change in the person occupying the office of the Commissioner of Social Security).

## BACKGROUND

Plaintiff, who has a longstanding history of migraines, applied for DIB on January 4, 2019. AR: 12.[3] His claim was denied initially and again upon reconsideration. *Id.* A hearing was held before Administrative Law Judge (ALJ) Diane Davis on December 7, 2020. *Id.* The ALJ denied Plaintiff's claim on March 30, 2021. *See* AR: 130-40.

On August 18, 2021, the Appeals Council issued an Order remanding the case to the ALJ. AR: 147-48. In the order of remand, the Appeals Council instructed the ALJ to consider medical records "from Sunil Nath, M.D., Colorado Springs Cardiology, dated August 2, 2019 (6 pages); emergency department notes dated July 24, 2019 (11 pages); treatment notes from Aparna Komatineni, M.D. dated January 27, 2020 to March 18, 2020 (16 pages); opinion from Ripley R. Hollister, M.D., dated March 16, 2020 (6 pages); and opinion from Jeff Reynek, NP-C dated October 23, 2019 (2 pages), which were submitted September 28, 2020." AR: 147. As the Appeals Council noted, this "unexhibited evidence directly relates to issues being adjudicated and should have been admitted into the record when received." *Id.* Additionally, the Appeals Council directed the ALJ to further evaluate the claimant's alleged symptoms." AR: 148. As part of this, the Appeals Council ordered the ALJ to explain her reasoning in accordance with the disability regulations pertaining to the evaluation of symptoms. *Id.* Finally, the Appeals Council instructed the ALJ to reconsider Plaintiff's maximum residual functional capacity and, in doing so, provide specific references to supporting evidence, evaluate medical source opinions, and, as appropriate, to request that a medical source provide additional evidence and/or further

---

[3] The court uses "ECF No. ---" to refer to specific docket entries in CM/ECF and uses "AR: ---" to refer to documents in the administrative record. The administrative record is found at ECF No. 6.

clarification of the opinions. *Id.*

The remand hearing was held on February 24, 2022. AR: 12. The ALJ again denied the claim on March 17, 2022. *See* AR: 12-27. The Appeals Council then denied Plaintiff's request for review in October 2022 (AR: 1-6), making the ALJ's March 2022 decision the Commissioner's final decision for judicial review. 20 C.F.R. §§ 404.981, 422.210(a). Plaintiff then sought review in this court. ECF No. 1. Plaintiff filed his opening Brief, ECF No. 8 ("Brief"), Defendant responded, ECF No. 12 ("Response"), and Plaintiff replied, ECF No. 13 ("Reply").

## DIB FRAMEWORK

A person is disabled within the meaning of the Act "only if his physical and/or mental impairments preclude him from performing both his previous work and any other 'substantial gainful work which exists in the national economy.'" *Wilson v. Astrue*, No. 10-cv-00675-REB, 2011 WL 97234, at *1 (D. Colo. Jan. 12, 2011) (quoting 42 U.S.C. § 423(d)(2)). "However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Social Security Act. To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months." *Brandon v. Colvin*, 129 F. Supp. 3d 1231, 1232 (D. Colo. 2015) (citing *Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995)). "[F]inding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." *Fritz v. Colvin*, No. 15-cv-00230-JLK, 2017 WL 219327, at *8 (D.

Colo. Jan. 18, 2017) (emphasis in original) (quoting *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994)).

The Commissioner is required to follow a "five-step sequential evaluation process" which guides the determination of whether an adult claimant meets the definition of disabled under the Social Security Act. 20 C.F.R. § 404.1520(a)(i)-(v) (DIB evaluation of disability of adults). If it can determine if the claimant is disabled or not at a step, the Commissioner makes the determination and does not continue to the next step. 20 C.F.R. § 404.1520(a)(4). However, if that determination cannot be made, the Commissioner proceeds to the next step. *Id.*

Step one asks whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is "not disabled regardless of [ ] medical condition, . . . age, education, and work experience." 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

Step two assesses whether the claimant has a medically severe impairment or combination of impairments under 20 C.F.R. § 404.1509. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not show "any impairment or combination of impairments which significantly limits [their] physical or mental ability to do basic work activities," the claimant is "not disabled" regardless of "age, education, and work experience." 20 C.F.R. § 404.1520(c).

Step three tests whether the claimant's "impairment(s) meets or equals" a listed impairment and "meets the duration requirement[.]" 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled regardless of "age, education, and work experience." 20 C.F.R. § 404.1520(d). If not, the Commissioner analyzes the claimant's residual functional capacity, or "RFC," which "is the most [the claimant] can still do despite [their] limitations." 20 C.F.R.

§§ 404.1520(e), 404.1545(a)(1).

Step four considers whether the claimant "can still do [their] past relevant work" based on their RFC. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e). To be disabled, the claimant's "impairment(s) must prevent [them] from doing [their] past relevant work." 20 C.F.R. § 404.1520(f). For guidance on this determination, "ALJs often seek the views of 'vocational experts.'" *See Biestek v. Berryhill*, 587 U.S. 97, 100 (2019) (citing 20 C.F.R. §§ 404.1566(e), 416.966(e)). If the claimant's "severe impairment" prevents them from doing their "past relevant work" or they have no "past relevant work," the analysis continues to the final step. 20 C.F.R. § 404.1520(g).

Lastly, step five considers the RFC assessment and the claimant's vocational factors— "age, education, and work experience." 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g)(1). Any other work the claimant "can adjust to must exist in significant numbers in the national economy (either in the region where [they] live or in several regions in the country)." 20 C.F.R. § 404.1560(c)(1). The Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). If the claimant "can make an adjustment to other work," they are "not disabled." 20 C.F.R. § 404.1520(g).

The claimant has the burden of proof at steps one through four. The Commissioner bears the burden of proof at step five to prove there is other work the claimant can perform. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The burden-shifting at step five, however, does not shift the plaintiff's burden to prove his RFC. 20 C.F.R. § 404.1560(c)(2) ("We are not

responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.").

## THE ALJ'S DECISION

The ALJ found that Plaintiff satisfied step one and then determined at step two that Plaintiff's migraines were a severe impairment. AR: 15.

At step three, the ALJ concluded that Plaintiff's migraines did not meet one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. AR: 17.[4] Because migraines are not a listed impairment, the ALJ addressed Plaintiff's migraines using the criteria found in Listing §§ 11.02(B) and (D) for dyscognitive seizures, pursuant to Social Security Ruling 19-4p. *Id.* Relevant here, paragraph B of listing 11.02 requires that migraines occur at least once a week for at least three consecutive months, despite adherence to prescribed treatment. *Id.* § 11.02(B). Paragraph D includes the following criteria:

> Dyscognitive seizures, occurring at least once every 2 weeks for at least 3 consecutive months, despite adherence to prescribed treatment; and a marked limitation in one of the following:
> 1. Physical functioning; or
> 2. Understanding, remembering, or applying information; or
> 3. Interacting with others; or
> 4. Concentrating, persisting, or maintaining pace; or
> 5. Adapting or managing oneself.

---

[4] The Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, sets forth medical criteria for evaluating whether a claimant's impairment is medically equivalent to one of the listed impairments considered presumptively disabling. *See* 20 C.F.R. § 404.1520(d); *see also Sullivan v. Zebley*, 493 U.S. 521, 532, 534-35 (1990); *Thomas v. Colvin*, 69 F. Supp. 3d 1174, 1178 (D. Colo. 2014). An impairment is presumptively disabling only if the evidence shows that *all* criteria of the listing are met: "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

*Id.* § 11.02(D).

Here, the ALJ found as follows:

The evidence does not demonstrate this degree of limitation. Of note, the record does not document the claimant's headaches occurred at least once a week for three consecutive months, despite adherence to prescribed treatment, as would be required to satisfy 11.02(B). The claimant is not keeping a headache log. There is no detailed description from an acceptable medical source of a typical headache event. In this case, the claimant's clinical examination findings were not reflective of a marked limitation in the claimant's physical functioning. Additionally, the claimant's benign mental status examination findings and lack of any mental health treatment during the relevant period are not reflective of the claimant having a marked limitation in any mental functioning areas. The claimant was able to drive to Denver to see specialists there, even when having a headache.

AR: 17 (cleaned up). The ALJ then proceeded to assess Plaintiff's RFC and found that he could perform "light work" as defined in 20 C.F.R. § 404.1567(b),[5] with the additional limitations of

the claimant can never climb ladders, ropes or scaffolds, work at unprotected heights or around major manufacturing machinery; he can tolerate no more than moderate levels of noise; he should avoid work outdoors in bright sunshine, no work with bright or flickering lights such as would be experienced in welding or cutting metals.

AR: 23 (cleaned up).

Although the ALJ determined that Plaintiff's RFC precluded him from returning to past work, she found that he could still perform the jobs of cafeteria attendant, cashier II, and routing clerk and concluded that these jobs existed in significant numbers in the national economy.

_____

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); *see also* Social Security Ruling 83-10, 1983 WL 31251, at *6 ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.").

AR: 25-27. With this, the ALJ found at step five that Plaintiff was not disabled. AR: 27.

## STANDARD OF REVIEW

In reviewing the Commissioner's decision, the court "is limited to determining whether the Commissioner applied the correct legal standards and whether the agency's factual findings are supported by substantial evidence." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014). "The phrase 'substantial evidence' is a 'term of art,' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek*, 587 U.S. at 102 (quoting *T-Mobile South, LLC v. Roswell*, 574 U.S. 293, 301 (2015)). In applying the substantial-evidence standard,

> a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contacts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Id.* at 102-103 (cleaned up); *see also Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004) ("Substantial evidence requires more than a scintilla but less than a preponderance.") (quoting *U.S. Cellular Tel., L.L.C., v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003)). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Zoltanski*, 372 F.3d at 1200 (quoting *U.S. Cellular*, 340 F.3d at 1133).

The court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Knight*, 756 F.3d at 1175 (citation omitted); *see also Zoltanski*, 372 F.3d at 1200 (the court may not displace the Commissioner's choice between two fairly conflicting views, even if

the court would have made a different choice if the matter had been before it de novo). Even so, this court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007)). "[A] reviewing court must uphold even a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Garland v. Dai*, 593 U.S. 357, 369 (2021) (cleaned up).

In addition, this court's review is guided by the harmless error doctrine, which the Tenth Circuit Court of Appeals applies to social security disability cases. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). A court "may apply harmless error in the social security context 'where, based on material the ALJ did at least consider (just not properly), [it] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'" *Armijo v. Astrue*, 385 F. App'x 789, 792 (10th Cir. 2010) (quoting *Allen*, 357 F.3d at 1145).

## ANALYSIS

On appeal, Plaintiff argues that the ALJ committed two primary errors: first, that she failed to find that his migraines equaled a Listing at step three, and second that she "failed to fully account for [his] migraines in the RFC finding." Brief at 2. Because the court finds grounds for remand based on the ALJ's RFC calculation, the court does not address Plaintiff's argument at step three. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (declining to address additional arguments raised on appeal because "they may be affected by the ALJ's treatment of this case on remand."). To thoroughly evaluate Plaintiff's arguments, the court begins with a

chronological overview of the record evidence concerning Plaintiff's migraines.

### A.   Evidence Related to Plaintiff's Migraines

#### 1.   *Plaintiff's medical records*

*2018*. Plaintiff reported that he began to suffer from chronic headaches in 1999. AR: 587. Since early 2018, when the time relevant to this appeal begins, Plaintiff has attempted numerous migraine treatments, including radiofrequency ablations, injections (of Botox and other drugs), and numerous prescription medications.[6]

On February 1, 2018, Plaintiff was seen by Narayana Varhabhatla, M.D., a physician at the UCHealth Pain Management Clinic, for an interventional pain medicine consultation. AR: 1008-12. At that appointment, Dr. Varhabhatla recorded that Plaintiff described his pain as

> occipital and radiates to the front, with intense periorbital pain. There is a constant headache with intermittent worsening with no warning or cause. He has photophobia and phonophobia, and is not able to work because of light sensitivity and vision changes. The pain is intense, like an ice pick, at times and most of the time is a throbbing headache.

AR: 1009. On March 12, 2018, Plaintiff received Botox injections for treatment of chronic migraines, which he reported reduced his migraines by "7 less headache days and at least 100 less headache hours per month." AR: 733; *see also, e.g.*, AR: 685-692 (additional Botox injections administered on 6/11/2018, 9/10/2018, 12/5/2018). At the March 12, 2018 appointment, Plaintiff reported that earlier occipital nerve blocks and medial branch blocks had been somewhat successful in reducing his migraines, although he was "going through a cycle of cluster headache on top of his chronic migraine" at that time. *Id.*

---

[6] The following summary does not attempt to delineate every medical intervention Plaintiff sought or to describe every treatment record.

On March 19, 2018, Dr. Varhabhatla performed a C2/3 radiofrequency ablation ("RFA") on Plaintiff's right side. AR: 731-733; *see also* AR: 710-712 (records of another RFA performed on 9/17/2018). On May 24, 2018, at an appointment during which Dr. Varhabhatla gave Plaintiff two trigger-point injections, Plaintiff reported that "[h]e may seek disability, he cannot work at the call center where he is currently working." AR: 726, 728. At that time, Plaintiff was informed by Jennifer Hong, M.D., that she "think[s] we can help manage his pain but it is unlikely his pain will ever completely resolve." AR: 726. Additional trigger point injections were performed by Dr. Varhabhatla on July 11, 2018, AR: 717-721, with Plaintiff reporting "near resolution (80-90%) of his posterior scalp shooting migraine pain." AR: 718. But Plaintiff also reported

> that he is suffering worsening/same of his RIGHT frontal/supra-orbital pain. This pain is constant throughout the day ranging from 4-8/10, waxing/waning. When it becomes 8/10 (daily) it is improved with rest, ice and darkness. +phonophobia, +photophobia, and nausea during worsening pain episodes.
>
> Was able to return to limited work yesterday (7/9/18) given the pain relief from the RFA but had to leave after work and rest in darkness with ice for the rest of the night. No changes to his medications. Requesting additional TPIs and discussion about an implanted stimulator.

AR: 718.

In October 2018, Plaintiff was seen by Giancarlo Barolat, M.D., a neurosurgeon who evaluated Plaintiff for a spinal cord stimulator, a procedure that involves the insertion of electrodes in the right nuchal/occipital and supraorbital areas of Plaintiff's brain. AR: 593-595. In his evaluation, Dr. Barolat described Plaintiff's migraines as "chronic, severe, intractable," and noted that Plaintiff "has responded only partially and temporarily to extensive injections and blocks. The patient is still basically severely handicapped by the condition." AR: 594. In short,

Plaintiff's "headaches are not controlled at all," and "[h]e is basically unable to work at the present time." AR: 593. In an accompanying psychological evaluation to determine Plaintiff's candidacy for a spinal cord stimulator, Emily McCann, Ph.D., recorded that Plaintiff described his "experience of pain as aching, throbbing, shooting, stabbing, sharp, exhausting, tiring, nagging, miserable, and unbearable," and relayed that, in the previous seven days, he had experienced pain of ten out of ten on a ten-point scale, with an average pain level of 5/10. AR: 587. Plaintiff reported to Dr. McCann that he was then on short-term disability from T-Mobile, where he had worked in a call center for the last five years. AR: 591. His goal for the stimulator was to "at least minimize the pain and actually be able to function on a day to day basis," and to "go back to work or go to school." AR: 591.

*2019-2020*. On February 4, 2019, T-Mobile—"with regret"—terminated Plaintiff's employment, noting that "[o]n May 7, 2018, [Plaintiff had] requested continuous time away from work as a reasonable accommodation due to [his] impairment." AR: 839. Neither T-Mobile nor Plaintiff's own physician could identify any accommodation that "would enable [Plaintiff] to return to work and perform the essential functions of [his] job" in the T-Mobile call center. *Id.* Plaintiff has not been employed since. AR: 42-43 (Plaintiff's testimony at administrative hearing that he was last employed in February 2019 but last worked on May 6, 2018).

At an appointment with the neurology clinic at the University of Colorado Hospital on February 27, 2019, Plaintiff reported to his medical provider that he had experienced some decrease in the intensity of his headaches, from thirty to approximately "3 to 15 headache[s] a month," since being prescribed the medication Aimovig in December 2018.[7] AR: 693, 694-95

---

[7] The court also notes that Plaintiff was taken off Aimovig due to side effects. *See* AR: 692.

(listing numerous past and current prescription medications for headache). Throughout the remainder of 2019, and throughout 2020, Plaintiff continued to seek treatment for his intractable headaches. By July 2019, Plaintiff was taking Emgality, which "was providing significant and sustained benefit"—reducing his headache hours by 100 hours per month and the number of headaches to approximately twelve per month. AR: 998-99 (Plaintiff "doesn't wake up with HA anymore but does get 3 to 4 HA [per] week"); AR: 997 (reporting on 9/18/2020 that he "improved somewhat on Emgality but still has 3-4 headaches per week").

In June and September 2020, Plaintiff's providers recorded that Plaintiff reported three to four migraines per week, with a duration of "1-72 hours per episode"—episodes which Ripley Hollister, M.D., Plaintiff's primary care physician, described as "very much global" and necessitated Plaintiff "stay[ing] at rest in a dark room during episodes." AR: 905; *see also* AR: 992, 997. In this timeframe, Plaintiff experienced headache symptoms of "visual disturbance, poor balance, vertigo, nausea, inability to concentrate due to pain," and a "visible neurologic symptom" of "ptosis of the right eyelid." AR: 904.[8]

*2021*. On New Year's Day, Plaintiff was transported via helicopter to the hospital after he developed a headache accompanied by "stroke-like symptoms" of slurred speech, left-sided weakness, blurred vision, and difficulty walking. AR: 1014, 1017, 1020. At the hospital, Plaintiff reported "chronic daily migraines attacks typically with photo and phonophobia and nausea. Approximately 1 time per week he will experience some degree of either dysarthria, diplopia, or imbalance." AR: 1022. He further reported that his neurologic symptoms that day were "new and

---

[8] The court understands ptosis to be a condition in which the upper eyelid droops or falls over the eye. *See* Ptosis (Droopy Eyelid): Causes & Treatment (clevelandclinic.org).

different than what he has previously had in the past." AR: 1030. Plaintiff's symptoms resolved while he was in the emergency department, although medical personnel proceeded to evaluate him "for signs of acute stroke but none were found and he was placed in the observation unit with the diagnosis of a presumptive [transient ischemic attack]." *Id.*

In a follow-up visit with Dr. Hollister on February 25, 2021, Dr. Hollister recorded that numerous medications and treatments had failed to treat Plaintiff's migraines—including "venlafaxine, Celexa, gabapentin, Topamax, verapamil, Soma, Flexeril, baclofen, radiofrequency nerve ablations, Botox injections ergotamine treatments, Aimovig, Ajovy, . . . Percocet, Zomig, nasal, Imitrex, ibuprofen indomethacin"—but that Emgality has helped "the severity of his symptoms and lessened the frequency." AR: 1584. Even with Emgality, though, Plaintiff reported that he continued "to have issues with migraines at least 3-4 times per week associated with light, sound sensitivity, in addition to nausea." *Id.* That level of headache frequency continued throughout 2021. AR: 1569 (9/9/2021 visit with Hollister); 1576 (4/8/2021 visit with Meghan Cogswell, PA-C at Colorado Springs Neurological Associates).

*2022*. In an appointment with Colorado Springs Neurological Associates on January 18, 2022—approximately two months before the remand hearing before the ALJ—Julia Brinley, D.O., recorded that Plaintiff "continues to have between 2 and 4 migraines per week, whose intensity is manageable on the medications" (including amitriptyline and Emgality). AR: 1559.

### 2.    *Testimony at the March 24, 2022 administrative hearing*

*Plaintiff*. Plaintiff stopped working at T-Mobile on May 6, 2018, because that employer could no longer accommodate the frequency of his absences from work. AR: 42-43. At that time, Plaintiff's headache pain was sometimes so severe that he "could not concentrate, I could not

speak clearly or understand when somebody was trying to relay information to me, as well as a lot of light sensitivity and sound sensitivity, which ultimately led to really – just a really, really bad, bad time. And there were also times where I could not actually drive because it go so bad." AR: 43. At the time of the hearing, "with some of the newer preventative treatments," Plaintiff has had "some success but there are still two to four episodes a week." AR: 44.

When a headache cannot be controlled, Plaintiff retires to a dark room and puts ice over his eyes. AR: 45. It can take anywhere from one hour to three to four days for a headache to resolve, during which time Plaintiff is confined to his bed. *Id.* After the headache is gone, Plaintiff testified, he is "fatigued for probably the next two maybe three days and then [he] will have some lingering nausea, as just kind of like general body aches" and light sensitivity that may require him to wear sunglasses inside. *Id.* Plaintiff does not know when a headache will hit:

> [T]he biggest thing right now is it's unpredictable. I don't know when I could actually work . . . or how long. So , that would probably be the biggest thing that's keeping me from working right now is the unpredictability.

AR: 49.

At the time of the March 2022 hearing, Plaintiff was able to drive "when I don't have the migraines" or any residual symptoms from a migraine. AR: 52, 55. If he cannot drive, his wife or children drive him to his appointments. AR: 55. He can prepare a simple lunch, but he is no longer able to do activities he previously enjoyed, including woodworking and brewing beer. AR: 54. He watches television, but reading triggers migraines. AR: 55. As Plaintiff put it, there is "not really a whole lot that [he] can do during the day." *Id.*

*Vocational Expert Donna Toogood*. The ALJ posed three hypotheticals to Donna Toogood, a vocational expert ("VE"), at the administrative hearing. In the first, the ALJ asked

the VE to assume "an individual of the claimant's age, education, and work experience," and

then:

> Further assume the individual can perform work at the light level of exertion as defined in the regulations, the full exertional range of light including the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently.
>
> The individual can never claim ladders, ropes or scaffolds, or work at unprotected heights, or around dangerous unprotected major manufacturing machinery. The individual can tolerate no more than a moderate level of noise as defined in Appendix D of the Selected Characteristics of Occupations 1993 Edition.
>
> The individual should avoid work outdoors in bright sunshine, and no work involving bright or flickering lights as would be experienced in welding or cutting metals.
>
> Could such an individual perform any of the claimant's past work?

AR: 58-59. To this hypothetical, the VE replied yes: the claimant could perform work as a

technical support specialist, as a customer service representative, as a sales representative, and as

a "system engineer." AR: 59.

> In a second hypothetical, the ALJ added the following additional rubrics:
>
> [T]he individual can understand, remember, and carry out simply routine tasks that can be learned and mastered in up to 30 days' time or less with a reasoning level of 3 or less, at such levels the individual can maintain concentration, persistence and pace, can make simple work-related decisions, can plan and set goals, can adapt to routine workplace changes, can travel, and can , and can recognize and avoid ordinary workplace hazards.
>
> That basically limits someone to unskilled work . . .
>
> Is there work in the national economy for such an individual?

AR: 59-60. The VE again replied in the affirmative, testifying that such a person—that person

being Plaintiff, in the ALJ's view—could work in three positions: (1) a cafeteria attendant, as described at DOT 311.677-010; (2) a cashier II, as described at DOT 211.462-010; and (3) a routing clerk, as described at DOT 222.687-022.

Finally, the ALJ asked the VE to assume "that the individual will be off task 15 percent or more in a workday, . . . would those jobs remain?" AR: 60. The VE responded that "being off task 15 percent or greater would be work preclusive." AR: 61.

On cross-examination, Plaintiff's attorney asked two clarifying questions:

Q If we add to hypothetical number 1 or hypothetical number 2 that such an individual would be absent two to four times per week either for whole days or part days due to migraine headaches, could such an individual perform the work that you identified?

A **Being absent two to four times a week on a consistent basis would be work preclusive.**

Q Okay. And is absenteeism addressed by the Dictionary of Occupational Titles?

A No, for that I rely on my experience as a vocational rehabilitation counselor.

*Id.* (emphasis added).

## B.     Errors in the ALJ's RFC Findings

The ALJ ultimately concluded that Plaintiff had the RFC to perform light work with additional limitations such as no climbing, no working at unprotected heights, and no work in bright lighting or in more than moderate noise. AR: 17.

Plaintiff claims that the ALJ's decision did not fully account for his migraines. As background for his overall argument, Plaintiff highlights the fact that he still experiences migraines approximately two to four times a week—a finding that the ALJ herself reached, *see*

AR: 20. He reiterates that his migraines are sometimes resolved in a few hours, but some can last several days, Brief at 7 (citing AR: 412), and that there are times when a migraine is so severe that all he can do is lie down in a dark room until the migraine passes. *Id.* at 8 (citing AR: 45). Additionally, as is the nature of migraines, Plaintiff emphasizes that he cannot anticipate when he will experience one or how severe it might be.

Given these headache traits, Plaintiff says that, although he is capable of far more than what the ALJ found while *not* experiencing a migraine, when he *is* experiencing a migraine—particularly one that is severe—there are times that he is incapable of doing any work. *Id.* (citing AR: 45). Plaintiff then highlights the VE's testimony that being off task—i.e., being unable to work when expected to—for more than 15 percent of the time would be work preclusive. *Id.* (citing AR: 60-61).

This is the critical issue Plaintiff claims the ALJ failed to fully consider. Put another way, Plaintiff says that the ALJ did not sufficiently address the fact that his migraines are sometimes so severe that he is unable to work and must be off task. Thus, argues Plaintiff, his migraines—and the absences/missed work hours that they cause—would prevent him from *maintaining* employment.

With this backdrop, Plaintiff raises several specific assignments of error as to the ALJ's RFC determination. First, he says that the ALJ's reliance on certain medical findings does not provide substantial evidence for her conclusions. Second, Plaintiff maintains that the ALJ lacks support for her conclusion that his testimony was not credible. Lastly, he insists that the ALJ failed to properly consider the opinions and findings of several medical sources.

### 1.    Medical findings

The ALJ deemed Plaintiff's professed limitations to be inconsistent with certain medical findings or lack thereof. Specifically, the ALJ highlighted Plaintiff's positive response to treatment, *see* AR: 18-19, the absence of a medical description of Plaintiff's migraines, *see* AR: 17, 21, and his normal neurological examinations, *see* AR: 18, as evidence discrediting his statements concerning the intensity, persistence, and limiting effects of his migraines.

*Efficacy of treatment*. Plaintiff admits that treatment has helped to reduce the frequency of his migraines and the overall severity of his symptoms. *See* Brief at 7. According to him, though, he still experiences two to four migraines per week, which the ALJ herself found when she noted that this frequency was an improvement from the daily migraines Plaintiff previously endured. AR: 19-20. The ALJ also mentioned that by September 2020, Plaintiff had experienced his best results with the drug Emgality, AR: 20, and by late 2021 Plaintiff's migraines were "stable" and his symptoms "manageable." AR: 20 (citing AR: 1559, 1661).

Yet, in the same paragraph noting the efficacy of Plaintiff's treatments, the ALJ recognized that Plaintiff "was admitted to the emergency room in January 2021 with symptoms of a headache, slurred speech, left-sided weakness, and difficulty walking that mostly resolved by the time the claimant was admitted for treatment. He was given abortive medication for a hemiplegic migraine and responded well to conservative therapy. He was discharged after a few days of treatment." *Id.* (cleaned up).

It is hard to square the ALJ's explanation that the efficacy of treatment detracted from Plaintiff's allegations with the fact that Plaintiff was admitted to the hospital for a migraine while taking the medication that yielded his "best results." More importantly, though, while treatment

has seemingly reduced the frequency and severity of Plaintiff's migraines, the ALJ's decision leaves the impression that Plaintiff no longer experiences the severe migraines that are the true basis for his claimed disability.

*Description of migraines*. Nor does the ALJ point to any medical providers who explicitly say that Plaintiff no longer experiences migraines of such severity. Rather, the ALJ claims that "[t]here is no detailed description from an acceptable medical source of a typical headache event," AR: 17. Respectfully, though, the evidence in the record belies this assertion. Even if the court were to accept the ALJ's discrediting the opinions of Dr. Hollister,[9] her decision does not grapple with other significant record evidence demonstrating the debilitating effects of Plaintiff's migraines.

For example, no mention is made by the ALJ of Dr. Varhabhatla, the pain management physician at the University of Colorado who treated Plaintiff and provided a detailed description of his headache pain: the manner in which it radiates, the associated photophobia and phonophobia, and its varying in intensity from "a throbbing headache" to its mimicking the thrust of an ice pick into his head. AR: 1009. The ALJ also does not acknowledge the description of Plaintiff's headaches set forth by Dr. Barolat, the neurologist who evaluated Plaintiff for the spinal cord stimulation device, who personally evaluated Plaintiff, and who recognized that Plaintiff was "basically severely handicapped by the condition." AR: 594.

These providers set forth detailed descriptions of a typical headache event for Plaintiff, including its associated phenomena, the frequency of his headaches, his adherence to prescribed

---

[9] Dr. Hollister described Plaintiff's headaches as "global" events in which Plaintiff "essentially needs to stay at rest in a dark room during episodes." AR: 905.

treatment, and the limitations in his functioning associated with his headache disorder. Although the ALJ's measuring stick for what constitutes an "acceptable medical source" remains unclear, the court would think that the descriptions above would satisfy any set of genuine criteria. Given this evidence, the court cannot make sense of the ALJ's conclusion that "[t]here is no detailed description from an acceptable medical source of a typical headache event," AR: 17.[10]

*Neurological findings*. The ALJ made multiple mentions of providers' benign neurological findings during their examinations of Plaintiff. This, too, fails to persuade the court. First, the law generally recognizes that there are no objective tests for migraines; therefore, it is unclear why normal neurological findings are relevant.[11] *Malik v. Colvin*, No. 12-CV-02932-WYD, 2014 WL 1257070, at *5 (D. Colo. Mar. 27, 2014) ("Many federal district courts recognize that there are no objective medical tests for evaluating migraines/headaches, and hold that there is no requirement that an impairment such as migraines be proven through objective medical findings."). Moreover, nothing in the record suggests that the neurological observations occurred while Plaintiff was experiencing a headache. The ALJ's reliance on Plaintiff's normal

---

[10] Although the court is hesitant to credit arguments that an ALJ has "cherrypicked" the record, the ALJ's failures to address the opinions of Drs. Varhabhatla and Barolat do not help dispel the prospect of such here.

[11] To sustain the ALJ's conclusion that Plaintiff's neurological findings are probative, the court would need to see support for the premise underlying that conclusion—that migraines cause abnormal neurological symptoms either before, during, or after onset—which the ALJ simply did not address. In the absence of that evidentiary bridge, the court cannot follow the ALJ's reasoning. *See Strickland v. Barnhart*, 107 F. App'x 685, 689 (7th Cir. 2004) ("The ALJ also appears to have thought, incorrectly, that the neurological test results somehow undercut Strickland's claims that her migraines are severely painful. In fact, nothing in the record suggests that these tests can confirm either the existence of migraines or their likely severity.").

neurological findings seems to be a red herring because they did not occur under the circumstances that Plaintiff says are the basis for his disability.[12]

This brings the court to another point made by the ALJ, where she stated that it was "statistically impossible for the claimant to be experiencing the frequency and debilitating effects of his headaches, such that he would not have a scheduled appointment during a time when having a headache." AR: 20. Plaintiff provides an eminently reasonable explanation for this phenomenon: he would reschedule his examinations when he experienced a headache. AR: 55, 81. The ALJ, though, stated: "From the record, [Plaintiff] has not had to cancel any such regularly scheduled visits, with again normal findings noted on examinations." AR: 20. But the ALJ's declaration seemingly overlooks Dr. Hollister's statement that Plaintiff "does not come into the office for evaluation [while experiencing headaches]." AR: 1463.[13]

Accordingly, the court finds that the medical findings—as currently articulated by the ALJ—do not provide the necessary substantial evidence for her findings and conclusion.

---

[12] And the court also wishes to highlight that other parts of the record suggest that Plaintiff *did* have abnormal neurological traits. For instance, Plaintiff's medical records from 2020 show that he experienced headache symptoms of "visual disturbance, poor balance, vertigo, nausea, inability to concentrate due to pain," and a "visible neurologic symptom" of "ptosis of the right eyelid." AR: 904.

[13] Once again, the ALJ's decision leaves multiple questions unanswered that the court cannot fill in after the fact. For one, it is unclear whether instances of Plaintiff canceling/rescheduling an appointment would show up on his medical records. The ALJ appears to assume that the records would reflect such information, but the court discerns no basis for this inference. Further, the ALJ did not address Dr. Hollister's statement that seemingly refutes her own.

### 2.    *Plaintiff's credibility*

Throughout her decision, the ALJ underlined Plaintiff's ability to perform household tasks and drive, AR: 18, 20-21, and the fact that he did not keep a headache log, AR: 21, as reasons why his testimony was not credible. Plaintiff says that this is not substantial evidence; in addition, he argues that the ALJ failed to account for his work history when she assessed his credibility.

*Daily activities*. Plaintiff says that his ability to perform tasks while not experiencing a migraine is not a compelling basis for finding that he does not have severe limitations while experiencing a migraine. The court agrees. As with her assessment of Plaintiff's neurological findings, the ALJ has not adequately articulated why Plaintiff's ability to perform household chores, drive, or engage in hobbies while not experiencing a migraine is relevant to his limitations while he is experiencing a migraine. Further, while the ALJ found it significant that Plaintiff was sometimes able to drive with a headache, the court is not fully persuaded by this. To reiterate, Plaintiff does not profess to be continuously debilitated by migraines every moment of the day. Moreover, Plaintiff does not claim that every headache/migraine is of the same severity. Thus, Plaintiff's ability to drive while experiencing a headache does not contradict everything he has testified to; in fact, his driving with a headache is expected, given the frequency of Plaintiff's headaches and the fact that not all of his headaches are debilitating.

*Headache log*. The ALJ also found it notable that Plaintiff had never maintained a headache log. But as an initial matter, the court notes that the ALJ has not cited any evidence that a doctor had asked Plaintiff to keep a headache log; rather, the record suggests that Plaintiff's physicians have never asked him to. *See* AR: 905, 1474. More fundamentally, though, the court

has not located any case or regulation requiring a claimant to keep a headache log or lending

support for the proposition that a claimant's failure to do so—when he has not been instructed to

do so by a doctor—detracts from his credibility. Although the court does not go so far as to say

that the absence of a headache log is irrelevant, the court finds that it is not substantial evidence

on its own to support the ALJ's conclusion.

*Work history*. Plaintiff claims that the ALJ was required to factor in his work history

when determining his credibility. Brief at 18-19. Plaintiff cites *Tyson v. Apfel*, 107 F. Supp. 2d

1267 (D. Colo. 2000), in support of this argument. In that case, the court found that the ALJ

erred when he failed to consider the claimant's work record and instead "selected insignificant

factors to discount [the claimant's] credibility." *Tyson*, 107 F. Supp. 2d at 1270-71.

Subsequent cases have not cited *Tyson* for the proposition that an ALJ must consider a

claimant's work history in every case. *See, e.g.*, *Jimison ex rel. Sims v. Colvin*, 513 F. App'x 789,

797 (10th Cir. 2013) (distinguishing *Tyson* because "the ALJ did not select insignificant factors

in finding Ms. Sims not credible"). Rather, the caselaw suggests that an ALJ's failure to consider

a claimant's good work history is a ground for remand only when an ALJ fails to articulate a

sufficient basis for why a claimant is not credible. *See id.* Here, as the analysis above

demonstrates, the ALJ has not provided sufficient reasons for why Plaintiff's testimony is not

credible. Therefore, the ALJ erred when she did not discuss Plaintiff's work history and factor it

into her determination of the weight to give Plaintiff's testimony.

### 3. *Medical opinions*

Finally, Plaintiff argues that the ALJ failed to properly consider the opinions of Drs.

Barolat and Hollister.

24

_Dr. Barolat_. While the ALJ does summarize parts of Dr. Barolat's findings, _see_ AR: 19 (citing AR: 593-95), she does not undertake any analysis of those findings. The Commissioner responds that nothing from Dr. Barolat qualifies as a medical opinion, and, therefore, the ALJ was not required to address his views.

A "medical opinion" is a statement from a medical source about what a claimant can still do despite his impairments and whether the claimant has one or more impairment-related limitations or restrictions in his ability to: (1) perform physical demands of work activities; (2) perform mental demands of work activities; (3) perform other demands of work, such as seeing, hearing, or using other senses; and (4) adapt to environmental conditions. _See_ 20 C.F.R. § 404.1513(a)(2); _see also Staheli v. Kijakazi_, No. 1:20-CV-00159-JCB, 2021 WL 5495694, at *3 (D. Utah Nov. 23, 2021). Dr. Barolat provides a statement, and as a neurologist, he certainly qualifies as a medical source. Thus, the operative issues are whether he spoke to what Plaintiff can do despite his impairments and whether Plaintiff has one or more limitations listed in one of the abilities listed above.

In his report, Dr. Barolat notes that Plaintiff's headaches are accompanied by photophobia and phonophobia and affect "his ability to work. There are many days when he is unable to work because of the pain and the light sensitivity. There are also many times when he is unable to drive." AR: 593. Dr. Barolat also states that Plaintiff's headaches "are not controlled at all" and that he "has responded only partially and temporarily to extensive injections and blocks." AR: 593-94. Dr. Barolat concludes by saying that Plaintiff "is still basically severely handicapped by the condition." AR: 594.

Although not said as explicitly as might be found with other medical sources, Dr. Barolat's statements address what Plaintiff can do despite his migraines and whether he has impairment-related limitations and restrictions in his ability to perform the demands of work activities. It is not the case—as the Commissioner contends—that Dr. Barolat is weighing in on the ultimate issue of whether Plaintiff is disabled. Rather, stating that Plaintiff is "basically severely handicapped" is one way of saying that Plaintiff's migraines cause him significant limitations.[14] Thus, the court finds that Dr. Barolat has provided a medical opinion that the ALJ failed to address. This alone warrants remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (noting that an ALJ has a duty to "give consideration to all the medical opinions in the record").

*Dr. Hollister*. Plaintiff further argues that the ALJ did not properly assess Dr. Hollister's opinion; however, having found that the ALJ failed to address Dr. Barolat's opinion, there is already a clear basis for remand, and the court need not proceed further. Nonetheless, the court believes it necessary to address one of the ALJ's reasons for disbelieving Dr. Hollister's opinion. In her decision, the ALJ discredited Dr. Hollister based on a "report" and opinion from Dr. Glass—a neurologist who reviewed Plaintiff's medical records as part of an application for private disability benefits—that she found persuasive. *See* AR: 20. Yet, Dr. Glass did not personally examine Plaintiff, and only a portion of his report appears to be in the record. *See* AR: 1461-1472. Perhaps the full report was mistakenly omitted from the administrative record.

---

[14] *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (stating that medical source opinions that a claimant is "'disabled' or 'unable to work' must not be disregarded but can never be entitled to controlling weight") (cleaned up).

26

But if it was not, on remand, the full report shall be assessed, and the ALJ shall consider the persuasiveness of Dr. Glass's opinion using the five factors set forth in 20 C.F.R. § 404.1520c(c)(1)-(c)(5), the most important of which are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2); *Miles v. Saul*, No. 20-cv-1456-WJM, 2021 WL 3076846, at *2-3 (D. Colo. July 21, 2021).

Accordingly, the court cannot accept the ALJ's assessment of the medical sources' opinions when she has not considered and/or addressed all the evidence that she is required to.

\*       \*       \*

This court recognizes its duty not to reweigh the evidence before the ALJ or to substitute its judgment for hers, *see, e.g.*, *Knight*, 756 F.3d at 1175, and it does not do so here. Rather, the court has "meticulously examine[d] the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall*, 561 F.3d at 1052. Having scrutinized the record in the manner required, the court finds that it would be deeply remiss in its duty to serve as a neutral appellate reviewer were it to accept at face value the ALJ's findings and her ultimate conclusion that Plaintiff is not disabled.

## CONCLUSION

Accordingly, the court respectfully **REVERSES** the Commissioner's decision denying B.A.B.'s application and **REMANDS** for further proceedings consistent with this Order. On remand, the ALJ should: (1) reassess whether Plaintiff's impairments meet a Listing at step three, and as part of this, solicit expert testimony on this issue; (2) recalculate Plaintiff's RFC; and (3) take all other measures necessary to comport with the court's Order. Judgment shall enter accordingly.

DATED: September 30, 2024      BY THE COURT:

_____

Susan Prose
United States Magistrate Judge